RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0324p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 07-5592

EBEN PAYNE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 98-00038—John T. Nixon, District Judge.

Argued: June 12, 2008

Decided and Filed: August 28, 2008

Before: NORRIS, BATCHELDER, and GIBBONS, Circuit Judges

_____

## COUNSEL

**ARGUED:** Craig P. Fickling, Jr., FICKLING & MADEWELL, Cookeville, Tennessee, for Appellant. David E. Hollar, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Craig P. Fickling, Jr., FICKLING & MADEWELL, Cookeville, Tennessee, Richard B. Mazer, San Francisco, California, for Appellant. David E. Hollar, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Sunny A.M. Koshy, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

_____

## OPINION

_____

ALAN E. NORRIS, Circuit Judge. Defendant was initially indicted in 1998 along with several co-defendants, and currently stands charged with multiple counts involving drugs, firearms, and violence, including multiple murders. The government has filed a notice of intent to seek the death penalty.

Since defendant's original indictment, he has been adjudicated incompetent to stand trial. In November 2005, doctors at the United States Medical Center for Federal Prisoners in Springfield, Missouri ("Springfield"), the federal facility where defendant was being held, determined that he needed to be medicated with anti-psychotic drugs for his own safety and the safety of others. Defendant refused to ingest oral medication, however, so the medicine was injected involuntarily. Afterwards, Springfield's administration held a due process hearing, where it was determined that continued involuntary medication was necessary for safety reasons.

In May 2006, defendant moved for an evidentiary hearing to determine whether the government could continue to medicate him involuntarily. The motion was granted, and it is the order resulting from that hearing that is the subject of this interlocutory appeal.

In its order, the district court ruled that, in addition to continuing to medicate defendant for safety reasons, the government could constitutionally administer anti-psychotic drugs to defendant in an effort to render him competent to stand trial. However, it placed a four-month limitation on this enhanced involuntary treatment, as well as other restrictions. For the reasons that follow, the order of the district court is affirmed.

## I.

Defendant was initially indicted on March 26, 1998 on charges involving drug trafficking and related criminal activity. Since then, the government has amended the indictment five times, most recently on September 27, 2002. Shortly thereafter, the government filed notice of its intent to seek the death penalty against defendant and two co-defendants.

The fifth superceding indictment includes charges that arose out of an alleged continuing criminal enterprise and drug conspiracy carried out by a Los Angeles-based street gang. Along with others, the defendant allegedly transported and distributed drugs, used and possessed firearms, laundered money, and engaged in violent acts, including assault, abduction, robbery, and murder. The charged conduct spanned a seven-year period from 1993 through September 1999, and was conducted in several cities. Defendant has yet to be tried.

In early 2004, defendant filed a motion for an examination and hearing to determine competency. He was monitored and tested at the Springfield facility, and on February 24, 2005, the district court found defendant mentally incompetent to stand trial, and placed him in the custody of the Attorney General to determine whether there was a substantial probability that in the foreseeable future defendant would return to competency pursuant to 18 U.S.C. § 4241(d).[1]

---

[1]The section provides:

**(d) Determination and disposition.** If, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General. The Attorney General shall hospitalize the defendant for treatment in a suitable facility–

   **(1)** for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward; and

   **(2)** for an additional reasonable period of time until–

      **(A)** his mental condition is so improved that trial may proceed, if the court finds that there is a substantial probability that within such additional period of time he will attain the capacity to permit the proceedings to go forward; or

      **(B)** the pending charges against him are disposed of according to law;
   whichever is earlier.

If, at the end of the time period specified, it is determined that the defendant's mental condition has not so improved as to permit proceedings to go forward, the defendant is subject to the provisions of sections 4246 and 4248.

18 U.S.C. § 4241(d).

While at Springfield, he underwent psychiatric evaluation by Dr. David Mrad, with medical consultation by Dr. Robert Sarrazin. Dr. Mrad is the forensic psychologist at Springfield and is the primary clinician responsible for defendant's treatment, having observed and evaluated defendant since May 2004. Dr. Sarrazin is the chief of psychiatry at Springfield and consults with Dr. Mrad on defendant's case. Dr. Mrad diagnosed defendant with schizophrenia.

In November 2005, the medical staff at Springfield noticed a deterioration in defendant's condition. He began to withdraw, refused to communicate with medical staff, and would not eat. Defendant's behavior also became more aggressive and erratic; several times he threw food trays at prison guards and resisted attempts to take blood samples. As a result, Doctors Mrad and Sarrazin concluded that defendant's mental illness, unless treated with medication, would endanger himself and others. Because defendant would not voluntarily take medication, medical staff involuntarily injected him with 100 milligrams of haloperidol mixed with two other secondary drugs.

Emergency, involuntary medical treatment without a prior hearing is authorized by 28 C.F.R. § 549.43(b). However, ongoing psychiatric medication requires a due process hearing under 28 C.F.R. § 549.43(a). Such a hearing was conducted by the Springfield administration on December 19, 2005. At its conclusion, the medical staff determined that continued involuntary medication was necessary for the safety of defendant and others. Defendant was alerted of his opportunity to appeal the hearing decision, but declined to do so.

Medical staff continued to administer haloperidol by injection due to defendant's continuous refusal to take oral medication. Defendant's health and medical condition improved, and he became more communicative with staff and cooperative in assessing his mental and physical health needs. However, though defendant has been continually medicated at the current dosage of 150 milligrams of haloperidol, according to Dr. Mrad, he remains incompetent to stand trial.

On May 10, 2006, defendant moved for an evidentiary hearing as to the propriety of continued involuntary medication. The motion was granted, defendant underwent further psychiatric evaluations, and the hearing was held on August 15, 2006.

## II.

"We review for clear error the district court's findings of fact and we review de novo the district court's conclusions of law." *Univ. Hosps. v. S. Lorain Merchs. Ass'n Health & Welfare Benefit Plan & Trust*, 441 F.3d 430, 433 (6th Cir. 2006) (citing *Anderson v. Int'l Union, United Plant Guard Workers of Am.*, 370 F.3d 542, 551 (6th Cir. 2004)).

Defendant challenges the district court's finding that the proposed drug treatment is substantially likely to render him competent to stand trial. Since this is a factual finding, we review for clear error. *Id.; accord United States v. Gomes*, 387 F.3d 157, 160 (2d Cir. 2004); *United States v. Bradley*, 417 F.3d 1107, 1113-14 (10th Cir. 2005).

## A. Involuntary Medication of an Inmate

The government may involuntarily administer anti-psychotic drugs to a mentally ill defendant "if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Washington v. Harper*, 494 U.S. 210, 227 (1990). However, "'[t]he forcible injection of medication into a nonconsenting person's body,' [the Court] said, 'represents a substantial interference with that person's liberty.'" *Riggins v. Nevada*, 504 U.S. 127, 134 (1992) (quoting *Harper*, 494 U.S. at 229). The *Riggins* Court further suggested that while "forcing

antipsychotic drugs on a . . . prisoner is impermissible absent a finding of overriding justification," it may be constitutionally permissible to medicate a defendant involuntarily to render him competent to stand trial. *Id.* at 135-36.

In *Sell v. United States*, 539 U.S. 166, 179 (2003), the Supreme Court confirmed that the government may indeed constitutionally administer anti-psychotic medication involuntarily for the purpose of rendering a defendant competent to stand trial. Under *Sell*, such forced medication for the purpose of restoring competency is permissible if the government establishes that: (1) important government interests are at stake; (2) involuntary medication is substantially likely to render the defendant competent to stand trial and substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel at trial; (3) involuntary medication is necessary to further the government's interests, and less intrusive means are unlikely to achieve substantially the same results; and (4) the administration of the drugs is medically appropriate. *Id.* at 180-82.

**B. Evidentiary Standard**

The Supreme Court did not explicitly state the evidentiary standard to be used by trial courts in evaluating the *Sell* criteria. Other circuits, in similar circumstances, have required the government to establish the *Sell* factors by clear and convincing evidence. *See, e.g.*, *Gomes*, 387 F.3d at 160 (adopting clear and convincing standard); *Bradley*, 417 F.3d at 1114 (same). Prior to *Sell*, this court also required that the government prove by clear and convincing evidence that forced medication for the purpose of restoring competency was necessary. *See United States v. Brandon*, 158 F.3d 947, 961 (6th Cir. 1998). This circuit has recently employed this standard. *See United States v. Green*, 532 F.3d 538, 545 (6th Cir. 2008). To the extent any question remains about the applicable standard, we reaffirm that "the risk of error and possible harm involved in deciding whether to forcibly medicate" for the purpose of restoring competency are "so substantial as to require the government to prove its case by clear and convincing evidence." *Brandon*, 158 F.3d at 961.

**III.**

On appeal, defendant asserts that the district court erred in finding that the evidence offered at the hearing is sufficient to establish the second *Sell* factor—that the proposed treatment is substantially likely to restore his competency.

Several doctors testified at the hearing, and forensic psychiatric reports prepared by Dr. Mrad were entered as exhibits. Dr. Mrad testified about the reports, and gave his opinion that defendant suffers from schizophrenia, and remains incompetent to stand trial. Dr. Mrad went on to characterize schizophrenia as a serious mental illness, with symptoms including delusions, disorganized thinking, loose associations, and flat affect. According to Dr. Mrad, defendant has exhibited these symptoms since his time at Springfield began in 2004, and the symptoms are consistent with prior forensic reports dating back to 1997.

Dr. Mrad testified that he is not certain that defendant, by continuing the current treatment of 150 milligram injections of haloperidol, would improve much more than he already has since he had been on this medicine and dosage for several months. The doctor did, however, state that Dr. Sarrazin, as the medication consultant, would have a better sense of the likelihood that continuing defendant's medication regimen would restore competency.

For his part, Dr. Sarrazin testified that, while he was uncertain as to whether competency could be restored with haloperidol alone, he believed that there was a substantial probability that the use of anti-psychotic drugs in addition to haloperidol would restore defendant to competency. Based on defendant's improvement since being involuntarily medicated, Dr. Sarrazin stated that, in his opinion, there was a substantial probability that by taking increased dosages of medication, changing

medications, and having adjustments to the medications made when necessary, defendant would attain competency.

Dr. Sarrazin cautioned that side effects of this increased dosage could include shakiness, feelings of stiffness in joints and muscles, and acathisia, which is characterized by a feeling that one's feet must keep moving. Generally, as the dose of medication increases, the likelihood of the above side effects increases as well. As of the time of the hearing, however, defendant refused to take medicines to mitigate side-effects from haloperidol. Because of this, Dr. Sarrazin warned that increasing the haloperidol dosage might be restricted if defendant experienced these side-effects.

The district court was sensitive to defendant's significant liberty interests. Accordingly, the order included several restrictions on the authorized treatment effort to restore competency. They included the following: (1) limiting treatment to four months; (2) requiring medical staff to request defendant take the medication orally before each injection, and explain potential side-effects; (3) requiring close monitoring of defendant's health, with the understanding that treatment should stop in the face of major side-effects or other problems, and a report made to the court; (4) requiring detailed reports to the court at six week intervals including progress towards competency, and any side-effects experienced.

Defendant argues that the second *Sell* factor was not met because Drs. Mrad and Sarrazin admitted that they were not certain that the proposed treatment plan would restore competency. This argument is not persuasive. The standard is not certainty, but rather substantial probability. The uncontroverted expert testimony was that the proposed treatment plan was substantially likely to restore competency without unmanageable side effects. The district court's decision to credit this testimony was not clearly erroneous.

## IV.

The district court's order authorizing the treatment plan designed to restore defendant's competency to stand trial is **affirmed**.